Case Number 20-5131, Protect Democracy Project, Inc., Avalanche v. National Security Agency. Mr. Abadi for the Avalanche, Ms. Haifez for the Avalanche. Good morning. Good morning. You may proceed when you're ready. Thank you, Your Honor. May it please the Court, I'm Michael Abadi on behalf of the Protect Democracy Project. On page 78 of the Joint Appendix, the District Court noted that it understands and shares our concern that, quote, otherwise responsive and unprotected materials may be incorporated into a document with material protected by the presidential communications privilege, thus rendering the entire document protected from disclosure. The Court noted on that page of footnote 5 that it was venturing no opinion as to whether the information we seek here, which was featured in the Mueller report concerning a conversation between the President and the Director of the NSA, was or was not protected by the presidential communications privilege. That is all we are asking for at this stage in the case, is for the District Court to be able to make a determination about whether the information disclosed in the Mueller report as probable obstruction of justice by the President of the United States is or is not within the bounds of the probable what? The Mueller report described this as the third instance of obstruction of justice by the President of the United States. The Mueller report also says that Admiral Rogers said that he's never been asked anything immoral or inappropriate or illegal. What do you do with that? Well, Your Honor, we believe that demonstrates why this wasn't, in fact, an exercise of the President's Article 2 decision-making responsibility. The Mueller report did, in fact, describe this as one of the bases on which obstruction of justice could be charged, and then went on to say if Mr. Mueller could have said that no charge was appropriate, he would have done so, but he couldn't. Yeah, what did the Attorney General say? Well, Your Honor, the Attorney General's characterization of the Mueller report is, in some sense, is inconsistent with what the report itself says because, again, Mr. Mueller's report says, and you've cited this, the Attorney General said there wasn't sufficient evidence to make out obstruction of justice. You say it's probable. The Mueller report didn't say that. The Attorney General refuted it. So where do you get your idea from? Your Honor, we do believe it's highly, whether it technically qualifies as the crime of obstruction of justice, we believe it would be highly inappropriate for the President of the United States to lean on the head of an intelligence agency in order to do what clearly seemed to be a personal favor to deal with trouble of an investigation was interfering with his foreign relations efforts with Russia. Was that proper? Was that proper for the Attorney General, for the President to make that statement to the head of national security? Your Honor, we don't believe that the asking issue here is proper, but I will say, was it proper for the President of the United States to inquire of the status of investigation when he had in mind possibly firing the FBI director? To inquire, I'm sorry, Your Honor, to inquire of whom? Inquire of the head of NSA, which started the Russia investigation. The President has the authority to fire the FBI director, correct? The President did, in fact, he has the authority to do this, head of the executive branch. Yes, Your Honor. Does he have the authority to make inquiries that relate to whether he should keep the FBI director on board? Your Honor, as we understand the conversation here, it was whether the President had the authority to ask the NSA director to make public statements refuting an ongoing investigation. Our argument is that this is not part of the President's article to responsibility, but we didn't get a determination. Our argument before this court this morning is we believe we're entitled to ask the court to take a look at that portion of the memo and determine whether it is or is not protected by the privilege. The district court did not disagree with us on the merits. It acknowledged our concern, but it said it was not going to reach that issue. And I don't know if the government... Mr. Boddy, do you concede on appeal that at least some of, some part of this memo is privileged? We're not disputing the district court's finding that there are some portions of the memo that apparently relate to article two functions. And you say that this is a good vehicle to modify what you refer to as the blanket rule against segregability for presidential communications privileged documents, but I don't think you dispute that this memo really concerned, documented this one conversation. Is that right? Well, we don't dispute, Your Honor. Of course, it's, our knowledge of the memo has evolved greatly throughout the case. Originally, the government refused to disclose its existence. And then in the series, after it had to withdraw the Glomar claim in light of the Mueller report, it filed two declarations about the memo and we persuaded the court to look at it in camera. I understand that when the court and the court looked at it in camera and made the comments that you refer to, but it seems that everybody's on the same page that this memo was in fact, just a portion of the conversation. It's only documenting, you know, one, basically one interaction over Russia and the president's perception that his interactions with Russia were hobbled by what he thought was an illegitimate investigation. So, so I'm just not sure that I see why this is a good vehicle for probing more generally into the question, whether one might, for example, have a memo that is free is far ranging and covers many different topics. And the memo unit would be in some way, unrelated to the material triggering the presidential communications privilege. That doesn't seem to be this case. Well, Your Honor, we do not know, as this court has said, from Vaughn on down, FOIA is a notoriously one-sided type of inquiry where we haven't seen the memo. So I can't tell you whether or not I believe the memo in camera could be segregated quite easily. I mean, it is our view that it likely could be, and we say it would elevate form over substance to say what would matter here is if Mr. Leggett wrote one memo about the conversation or two, one memo that talked about the other aspects that the district court examined and found protected, and a separate one about the unique part of the conversation that was the most unusual thing he had seen in 40 years of government service. He could quite easily have done that. And then the government wouldn't be having, wouldn't be making the same argument. It's never made an argument about why this ask is protected by the presidential communications privilege. So we don't think it should matter whether there's one or two, but more to the point, Your Honor, this court has about presidential privilege communication, the language of 552B from FOIA requiring segregability in all cases. And I don't believe it's ever had a vehicle. We considered that. I believe we considered that in, I know we have definitely considered that. Judicial Watch 2, sealed case. No, Your Honor. Sealed case was a grand jury case. Right, no FOIA, right. Judicial Watch 1, Your Honor, if I may, I'm sorry, I don't mean to cut you off, but Judicial Watch 1 was not about whether portions of a memo were protected or not. The question there was whether the pardon attorney's office that never went to the White House. No, I'm thinking of a case that the parties didn't say, which is another Judicial Watch case from this court from 2005, and that's 432 Fed Third 366, in which the court does tee up that very language about non-segregability and addresses it, holding that it's the nature of the privilege in the context of a work product, not a presidential communications. But the argument is that the work product doctrine shields the materials because of the nature of the attorney's function. And the analogy here would be that the presidential communications privilege shields the materials because of the nature of the president's function. And so once you've that segregability, it's the scope of the privilege that displaces the statutory requirement or that is commensurable with the statutory requirement of segregability. I'm sorry, Your Honor, I didn't mean to cut you off. Once again, we are not arguing here for a had been considering this portion of the memo and said, this is covered by the privilege connected to Article II decision-making, this material of privilege, we wouldn't be making the argument we're making today. We're here because the court felt it couldn't do that. And FOIA requires in all instances in 552 that any reasonably segregable portion of a record shall be provided to any person requesting such record after deletions of portion, uh, which are exempt under the subsection. So are you arguing that this panel consistent with Judicial Watch II and Inmate Sealed Case could hold that on the facts here, the district court should have conducted a segregability analysis? Are you only preserving your argument for en banc? Well, I would say two things, Your Honor. Although this court has said in Judicial Watch I and II that it applies to the whole document, it has never been called upon to that reasoning in a case. As the panel, this court could consider that and decide whether or not it is binding. Obviously, the district court here felt it was. If this court feels it is so bound as well, uh, we would eventually be likely to ask the court en banc to reconsider that. And what, and what's your argument that it's not binding? Well, again, the court has never actually applied it. In Judicial Watch I, the court cited Inmate Sealed Case, which was again a grand jury case, and it was describing the presidential communications privilege, and it said in passing it applies to the whole document. It never again touches on that or applies that to the facts of that case. And in fact, if you look at Inmate Sealed Case, the grand jury case, the court there vacated and remanded and sent that case back to the district court for a determination on a line by line basis of whether a need can overcome any of the privileged information. But we do have a holding that the need is not relevant in a FOIA case. You've argued to the contrary, but that seems pretty clear. But again, I'm not suggesting that's a direct application from Inmate Sealed Case to here. We're not asking to overcome the privilege. We're asking for the routine of applicability of FOIA segregation analysis here. And my point is, to the extent Judicial Watch relied on a case that did ultimately remand for a line by line, that I don't think it was a fair extension of that doctrine. The first historical instance of invocation of the presidential communications privilege did not make any distinction of the segregability of any of the material that the president refused to disclose. You know who the president was? Well, I know that the Nixon case is the first time that the Supreme Court considered... No, no, no, no. George Washington withheld from Congress all the material that resulted in the Jay Treaty, and he refused to provide any of it, segregable or not. Your Honor, again, we are not disputing that there are circumstances where the presidential communications privilege might apply broadly to an entire doctrine. And had the district court determined that here, again, our argument would be very different right now. But we at least would have had the court consider the question of whether the specific information here, which again is so serious that it was featured in the Mueller report, whether that is in fact covered by the privilege that this court has said over and over, must be construed as narrowly as is necessary only to protect legitimate argumentative decision and that there is a potential for serious abuse of this privilege to allow for the withholding of information that would show wrongdoing by high-level executive branch officials. So, Mr. Abate, you seem to be weaving together two different strands. One, the misconduct cases, and two, segregability. And is the basis for your claim of segregability is that there's reason to think that part of this memo documents potential obstruction of justice and that to the extent that it may, that is no longer privileged. And if it is no longer privileged, then it's as distinct portion of the memo that should be segregated and released? No, Your Honor, let me try to be as clear as I can about our position. We have a two-fold position, our primary argument and our alternate argument. Our primary argument comes directly from the text of FOIA, and it is that in all FOIA cases, regardless of the privilege, segregability is required. We think that's clear from 552. And we also believe, Your Honor, that is clear from the FOIA Improvements Act of 2016, which put an additional burden on agencies to release anything not inconsistent with the underlying exemption invoked and to take additional acts to segregate and release information. That's your primary argument, and that seems foreclosed by precedent, unless I'm missing something. And your secondary argument? The secondary argument is that this court could recognize in a unique subset of cases that's never before been addressed by this court that that segregability is allowed in the very narrow context where there's credible suggestion that non-privileged, not privileged material, but non-privileged material appearing in a document would document misconduct. This court under FOIA, in various exemption contexts, has grafted misconduct exceptions that allow for special rules, usually to overcome an exemption claim. We are asking for something adequate basis for believing the documents would show, that are non-privileged and would show misconduct by high-level officials, that the normal rule of FOIA segregability, compelled by the plain language of the statute, would return. That's all we're asking for. We are not asking here for a rule that would allow us to get something the district court were to examine and say is validly covered by the privilege. But you're asking for something in a way that's more aggressive and that seems difficult to administer in the sense that we wouldn't even recognize the privilege based on this court's characterization of the president's comments as potential obstruction of justice? Well, what this court has said in numerous other cases involving misconduct and how it implicates FOIA, excuse me, what numerous district courts within this circuit have said, applying this court's precedent, is that all that's required is a, quote, adequate basis for believing that material sought would shed light on government misconduct. And in such instances, again, under Gluger deliberative process, for example, the privilege- Right. But that's been in the deliberative process privilege. And here we're talking about presidential communications privilege, which we know is different and more robust. I mean, it's one thing if the basis for the privilege, which here is communications about the footing on which the president is able to negotiate with another national government. If that's one part, and then if in another part of the same conversation, the president says, and how are we coming with the cocaine trafficking operation out of the map room, that would be an easier call, it seems to me, to say, well, that's not an exercise of the referring to as the misconduct evidence within the memo versus the rest of it. It's also, you know, even granting that it's obstruction of justice, it's obstruction of justice that's intertwined with the exercise of Article II, topically Article II powers. And, you know, and you can say, well, as a formal matter, once it's obstruction of justice, it's no longer permissible Article II. But asking us at the threshold to make that determination seems extraordinary. Well, Your Honor, again, we're not asking, we're asking that the district court be allowed to consider whether the contents of the memo that relate to this conversation, which the government is officially disclosed through the Mueller report, which has been revealed, this is not trying to pry into some conversation that the public doesn't already know about, whether that has a nexus to an Article II decision making responsibility. I want to be clear that if I answered your prior question, we are not asking that if it is obstruction, the privilege evaporates and it goes away. We are not disputing that there could be some things that we would characterize as misconduct, but are legitimately privileged and are protected. That is why what we're asking for is very different than the misconduct exception in the deliberative process privilege. We think the normal default rule that all FOIA cases should apply here, even with this privilege. If there are portions that are reasonably segregable that do not fall within the privilege, because for example, not every communication with the president, it's clear from this court's doctrine, is by definition always covered. It has to be, have some nexus to a function or a decision that is committed to the president under Article II. If the president is having conversations that relate to normal government operations, that don't call for Article II responsibilities, that is not within the scope of the privilege. And it has to be, there are other privileges that may protect it, deliberative process, it may be classified. There are all sorts of other ways that it might be protected, but the unique nature of this very powerful privilege is that there has to be a nexus to an Article II function. And here we're simply asking for courts to be able to do what they do every day in cases that involve equally serious things, such as, you know, information classified under national security laws, information protected by mandatory withholding statutes, like sources and methods of intelligence gathering. All of those things courts routinely deal with and conduct segregability analysis, just as FOIA argues. All right. Do my colleagues have further questions for Mr. Abbate? Just one, if I might. With regard to presidential communications privilege, does Section 5, does Exemption 5 do anything that the Constitution doesn't already do? Well, of course, this is incorporated into FOIA through Exemption 5, Your Honor. And there is no Article II language, for example, that compels the privilege to work in a particular way. So Exemption 5 incorporates into FOIA the judicial and common law construction of the presidential communication privilege and allows agencies to assert that as an exemption under FOIA. I haven't heard, and I'm not aware of any authority saying that Article II itself compels, for example, this whole document. There may well be separation of powers concerns that motivated the recognition of the privilege. But again, this derives from common law. And the important point here is Congress, of course... You say common law, but a statute can obviously preempt common law. Statute can't preempt constitutional law. So is it your position that this question of presidential communications privilege is non-constitutional common law? Or would you kind of concede that it's constitutional law? We concede it has its roots in separation of powers, no question, Your Honor. But we do the notion that the Constitution specifically prescribes, for example, that the entire document has to be protected versus just portions of it that bear on Article II responsibilities. And our view is Congress is permitted in FOIA to override it to the extent that what Congress is doing doesn't violate Article II directly. Okay. That's all for me. Thank you, Your Honor. Judge Randolph? All right. Well, we'll give you, Mr. Abate, a couple minutes for rebuttal. And meanwhile, we'll hear from Ms. Heifetz for the government. We're not hearing you. Good morning, Your Honors. I had contacted the clerk's office because of a phone issue, a connection issue, and was hoping to be brought in on a different line that I can use. Is that possible? I apologize for slowing the argument. Yeah, let's ask. She's listening, so I think she's going to hear this. If not, we can continue and then I apologize. So you would want to be brought in? There was a 617 number, 617-794-2665. And how does it work from your end? They call you? You don't call in? No, I believe I have to be brought in. Okay. So are you in a waiting room now? Did you call into the call? I am here on this phone, but was hoping I could... We can hear you just fine. Yeah, you can. Okay, we'll continue here. If I cut out, then I apologize, and then I'm sure that at that point, they'll be able to bring me back in. Oh, here, perhaps it is. Welcome to Zoom, Mr. Government. Please press 1 to join the meeting. This meeting is... I think that I'm back. Yes. Okay, wonderful. Thank you so much for your patience. I really appreciate it. It's been a morning of some technical struggles, but I very much appreciate your patience. You know, as the Court has noted this morning, this case is about a single conversation that  and the director of the National Security Agency. And in that back and forth that the District Court stressed was about a central set of interrelated issues related to presidential deliberations, specifically matters of foreign relations and national security, namely intelligence gathering. So I think this Court has accurately characterized this morning what this back and forth look like. It's integrated and organic nature. And as plaintiff's initial on bond petition recognized, this case really is governed by case law. Under this Court's decisions, under the Supreme Court's decision, set of decisions in the Nixon cases, under this Court's presence outside of FOIA, as well as in the FOIA cases, taking all of that together, there's nothing about the memo that takes it outside the presidential communications privilege. What plaintiff is really asking the Court to do is to take a conversation where, again, the president is asking the NSA director, essentially, as the Mueller report describes, the key portion that plaintiffs are focused on, about news stories linking with Russia and whether the NSA director can make a public statement. Presidents ask, heads of agencies ask, White House counsel ask, LLC, whether various courses of conduct are possible. And sometimes the answer is no, if something is inappropriate or is out of lawful. And that's not what takes the conversation that the president himself or herself is holding with a top advisor outside the realm of the presidential communications privilege. We want the advisor to be able to answer those questions honestly, accurately, candidly, even when the answer is no, that something's unlawful, or something's inappropriate, or whatever the case may be. Ms. Chaffetz, let me ask you about a hypothetical. Imagine there's a thousand page report that does not qualify for any FOIA exemptions, including does not qualify for the executive branch wants to nonetheless not disclose, they want to make sure this report is not disclosable under FOIA in the future. So they add one sentence to that thousand page report that clearly qualifies for the presidential communications privilege. Is it your position that the entire thousand page report becomes privileged? Your honor, the thousand page report, obviously many times counsel get in front of you, I'm stressed by that case is not the best case. I just want to say at the outset, all of that is very applicable here. But no, I think your honor, I don't know that a thousand page report is even a single record. I mean, we need to- That's our other case. We have that case too. I think that that's really an important point here. I mean, we have to recognize that there's no dispute here. The district court looked at this document in camera and understood that we're not talking about a thousand page report, a 500 page report, anything like that. We're talking about a single conversation between the president and the head of MSN. I know, but Ms. Jacobs, let me interrupt you. I know that this is not this case. It may not be outcome. My question may not be outcome determinative for this case. I think you're on awfully strong ground in this case. But I am just trying to figure out what the breadth of this very broad privilege is, understandably and justifiably broad privilege. Assume that the thousand page report is one record. If that case were before us, does the one sentence make the other thousand pages presidential communication privileged? No, your honor. I don't even know what that really means. So in a thousand page report, we're not talking about a conversation that the president is a part of a back and forth and organic. So that means looking more like the allegations of the plaintiff where you're talking about something thrown in utterly by happenstance. And again, that's not this case, but that's important because I'm not sure that in that circumstance, I think we would think about whether or not the whole of the document is properly understood. And if the district court had looked at a document like that, well, instead, these are separate records. This has nothing to do with the other part. This isn't a presidential communication. There is, you know, here. What about where there, it is one record, it's one, you know, written by one author and it flows. So in that sense, it's in the colloquial sense, it's one record. And it's all about a conversation with the president. But part of it is about, you know, baseball, and part of it is about, you know, foreign relations. The position of the government is that the part about baseball, there's no obligation to segregate that as outside of what article two and the common law developing the privilege protects. The Supreme Court in the Nixon case, for example, talks about the fact that even in a conversation with the president, you can have casual references that are important. And nobody thinks it's actually pretty hard to hear all of the president's sound is bad. I've missed that. In the Nixon case, is this any better? I apologize for the visual, but as long as the audio is good. In the Nixon case, you know, there's mentioned the fact that even where you have casual reference, idle conversation, when it's the president himself talking and having a conversation with his top advisor, there's never been a case in which a court has suggested that the proper approach to determining whether the item is privileged is to go through that have concerns about a particular line. Now, you know, we haven't had very many cases. So we have what you're relying on for your opposition to segregability, I gather, is the second judicial watch case, loving and the in race field case, right? For the segregable non segregability. Yes, and the segregability point, I think it's important to recognize that in every field case, there were materials that were entirely factual. And so the court really was confronted with the question of what is the scope of the privilege, and recognize that it did apply in the pardon cases, you have materials that are have factual material in them, that are not just necessarily precise things that were being advised about the deliberations themselves, but are all of a piece. And here we have a conversation where everything is of a piece, it's a back and forth, it's an organic discussion. Right, that's exactly so in in the in race field case, the back and forth was, was about and that's the sort of the origin of this of this line that everyone at the sentence that everyone at the in their entirety phrase that the subsequent cases refer to it, but that was in context of distinguishing deliberative process, which would cover the deliberations, but not the facts and the presidential communications process, which more akin to work product is covers facts that are part and parcel of the advice giving process. That's the only issue that was before the court in race field was this, is it just the deliberation? Or is it the does it include the intertwined factual material? But none of these cases, as I read them has gone broader to say where there is material that is neither factual nor deliberative. Does it nonetheless somehow fall within the presidential communications privilege? We're not suggesting here today that purely private conversations about baseball that the of the privilege, again, per the Nixon case, even when idle conversation, there may be something that comes up that does, you know, take it outside the realm of purely private conversation. And it was recognized in the in the grand jury proceedings cases during the Clinton administration, the Clinton administration that, you know, no court has ever declined to treat the specific topic. You know, the President may well address personal matters within the context of official decision making. And I think the point, Your Honor is making, this court has never been asked to go further field, we're not asking the court to do that today. The nature of the conversation that's at issue in this case, doesn't take us into that terrain. Clinton's argument, however, would take us into a very difficult place, contrary to presidential communications privilege. Can you just hold it a little closer? Because we're losing you even when it's just a few inches off. But but in in Ray Seald, so what we do have here that would I think take us into new terrain is a different kind of claim of the relationship between the privilege and misconduct in in Ray Seald, we defended the preservation of the presidential communication privilege, even in cases involving misconduct, by explaining that it was really important that there be communications about the misconduct so that there could be effective supervisory branch control over officials that might be abusing office, but that justification would not seem to apply in this case where the allegation is misconduct by the President himself. Well, in the go back to the Supreme Court, Nixon cases, just discussing the application of the privilege, the Nixon cases, we have a desire for information because we have a number of people who've been indicted presidential assistants who've been indicted for criminal conspiracy and testimony about what they expect to find on those case. And the Supreme Court never suggests and in Ray Seald case, Judge Walt's decision in Ray Seald case for this court emphasizes this. The Supreme Court discussion never suggests that that means that the presidential communications privilege doesn't apply. That never means that the materials are not privileged. The question it raises is one of balancing and whether there's a need for the materials that overcomes the privilege. And what we know in FOIA is that we don't do that balancing and that's our FOIA diverges from those cases. Even if it were a civil case, right? If it were, we've held, even if it were a civil case that the showing of need could trump. Absolutely. Del and Brie Powell, yes. In civil litigation, that's certainly a possibility. Were we wrong then? The black treasury case. Were we wrong to say that a FOIA case, and I know we have so said, but to say that a FOIA case can never amount to a showing of need because people are just entitled to the information. But why is the policy behind civil litigation stronger than the policy behind FOIA, which assigns to the So, to be fair to Ms. Corey, it's not the court saying that. It's the Supreme Court saying it is FTC versus Crawley or whatever aircraft time and time again. I mean, this is a principle established by the Supreme Court with regard to FOIA. And it's based on the fact that the question as written by Congress for exemption five is whether the materials will normally be available. So, we don't get into the analysis of need and balancing. We're not here comparing civil litigation with FOIA and suggesting other civil litigation is stronger. It's that FOIA is a statutory construction and has these rules because it provides for broad public disclosure. In these other cases where we're dealing with grand jury subpoenas, trial subpoenas, other criminal prosecutions, or in the case of Dellum's civil litigation, we're still dealing with requests for review in camera, not necessarily limited to the court in camera. There's another answer that you're missing, which is that when there's a FOIA requester and the FOIA requester gets the information, there's no obligation for that person to even share it with another member of the public. They can take that information, tear it up, and throw it in the waste can. There's absolutely no requirement whatsoever. That is certainly true, Your Honor. But I think here, part of the reason that there's such caution around the disclosure is because when something is disclosed under FOIA, from the government's perspective, the egg has been cracked and it's out there in the world. You can't un-break the egg, so to speak, and material is public. Whereas in these other cases where there's a balancing going on, that's not true. It's a different approach. The point really is that we're not suggesting that the privilege shields this information in all contexts. We're just talking about a FOIA request. Right. Right. So if my colleagues don't have further questions, I think we'll hear a brief rebuttal from Mr. Abate. Thank you for your patience this morning, Your Honor. No problem. Thank you for your argument. Thank you, Your Honors, and I will attempt to be very brief. Need is not the issue that is present before the court this morning because, contrary to the government's implication, we're not arguing to overcome privileged information. That's where the calculus comes in. We are arguing for the right to seek the release of non-privileged information in a document that happens to contain privileged information. That is the basic command of FOIA. I know that you've briefed this and you've argued this at length. I'm not really sure that I follow how words the President said in the context of the interplay between his interactions with a foreign government, Russia, and the activities of domestic intelligence agencies is not under the presidential, is not at least prima facie under the presidential communications privilege. I'll try to respond as directly as I can. Not every presidential conversation is protected by this privilege under this court's case law. There has to be a nexus to decision-making. We believe that Admiral Rogers' statements in the Mueller report show that the President wasn't making a decision about how to handle the Russia investigation. He was asking, can you do anything? And the answer, I gather, was no. That's information that a President then uses in going forward. Obviously, I understand your point that it wasn't just a question, it was a nudge, it was pressure, whatever. But in terms of the logic of the privilege bracketing its propriety or not, just as a prima facie matter, to say, hey, could you go assassinate my enemy? It's part of deliberation about how to run the country, even if it might also be criminal. Your Honor, I tried to clarify this before. Our argument, this is not privilege, does not depend on whether it is or isn't his conduct. It depends on whether it is or isn't related to a decision the President must make. And I will note, again, the government has not argued at any point in this case, even though we've repeatedly briefed that the ask was outside the document. They argued it was within it. They argued other parts of the document were within it. The district court did not resolve this issue. She acknowledged our concern and said she was troubled by it, but footnote five at page 78 refused to decide that question. We believe we're entitled to a substantive examination of whether the ask is indeed connected, and the court reviewed it in camera. We haven't seen it, but we have serious concerns about the government's mischaracterization, given one, its Glomar response, and then two, the district court's finding that it said things about the memo that were not accurate. The district court noted it was concerned with the mischaracterization of the memo. And so we believe that it is entirely appropriate for the court to be able to answer the question of whether this, this was not a routine discussion of what does the NSA capabilities allow us to do with foreign adversaries. The director said this is all right. The usual other, other questions from my colleagues, not for me. Nope. All right. Thank you very much. The case is submitted.
judges: Pillard, Walker, Randolph